LORILLARD TOBACCO CO., R.J. Reynolds Tobacco Co., Philip Morris Inc., Brown & Williamson Tobacco Corp., and United States Tobacco Co., Plaintiffs,

v.

Thomas REILLY, in his official capacity as Attorney General of Massachusetts, Defendant.

Consolidated Cigar Corp.,; General Cigar Co., Inc.; Havatampa, Inc.; John Middleton, Inc.; L.J. Peretti Co., Inc; Swedish Match North America, Inc; Swisher International, Inc.; and Tobacco Exporters International (USA) Ltd., Plaintiffs,

v.

Thomas Reilly, in his official capacity as Attorney General of Massachusetts, Defendant.

Nos. Civ.A.99–11118WGY, Civ.A.99–11270WGY.

United States District Court, D. Massachusetts.

Jan. 24, 2000.

James V. Kearney, Christopher R. Harris, Latham & Watkins, New York City, Peter C. Netburn, Peter G. Hermes, Hermes, Netburn, O'Connor & Spearing, Boston, MA, for Consolidated Cigar Corporation, General cigar Co., Inc., Havatampa, Inc., John Middleton, Inc., L.J. Peretti Co., Inc., Swedish Match North America, Inc., Swisher Intern., Inc., plaintiffs.

George J. Skelly, Skadden, Arps, Slate, Meagher & Flom LLP, Boston, MA, for United States Tobacco Company, plaintiff.

Thomas F. Reilly, Attorney General's Office, William T. Matlack, William W. Porter, Michael G. Hering, Assistant Attorney General, Office of the Attorney General, Boston, MA, for Thomas F. Reilly, Attorney General of the Commonwealth of Massachusetts, defendant.

Robert B. Collings, United States District Court, Boston, MA, for ADR Provider, pro se.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. CIGARETTE ADVERTISING IS FUNCTIONAL PORNOGRAPHY

The metaphor is apt. Both are entirely legal. Both are spawned by and supported by multi-billion-dollar industries generating significant economic activity. While ostensibly clucking in disapproval, millions of adult Americans support each industry with considerable cash outlays yet seek to have the government teach our children to avoid that which so many of us eagerly purchase.

Both cigarette advertising and pornography are protected forms of speech, reaching out to offer messages or products desired by and legal for adults. At the same time we leave it to our government to seek to shield our children from both of these forms of speech, believing them to be either inherently corrupting (pornography) or an inducement (cigarette advertising) to engage in an activity unlawful for minors. This dichotomy in the way we try to administer our visual world—a dichotomy in which adults value certain forms of speech but at the same time wish to eliminate vulnerable children from the audience—lies at the center of this case.

## II. PROCEDURAL POSTURE

Responding to concerns about the use of tobacco products by minors, the Attorney General of the Commonwealth of Massachusetts promulgated regulations on January 22, 1999 (the "Regulations") that render certain . types of tobacco product advertising and promotion "unfair or deceptive acts or practices" under Mass.Gen.Laws ch. 93A, § 2(a). *See* Mass.Gen.Laws ch. 93A, § 2(c) (1999). The Regulations, which become effective on February 1, 2000, essentially prohibit advertisements visible from areas likely to be frequented by minors. A companion set of regulations places the cigar industry under advertising restrictions and label warning requirements for the very first time. *See* Mass.Regs.Code tit. 940, §§ 22.00–22.09, as amended Jan. 19, 2000. Several cigarette and smokeless tobacco product manufacturers, namely Lorillard Tobacco Company, R.J. Reynolds Tobacco Company, Philip Morris Incorporated, Brown & Williamson Tobacco Corporation and United States Tobacco Company (collectively, the "Tobacco Companies"), seek a declaration that the Regulations are unconstitutional under the First Amendment. Several cigar manufacturers, namely Consolidated Ci-

gar Corporation, General Cigar Company, Havatampa, John Middleton, L.J. Peretti Company, Swedish Match North America, Swisher International, and Tobacco Exporters International (USA) (collectively, the "Cigar Companies") join the Tobacco Companies in challenging the Regulations under the First Amendment and also bring a challenge on the basis of the Commerce Clause of the Constitution. The Commonwealth of Massachusetts, through its Attorney General Thomas F. Reilly (the "Attorney General"), also moves for summary judgment. Since there are no material facts in dispute concerning these issues, and the parties have filed cross-motions for summary judgment, a declaration as matter of law concerning the validity of the Regulations is in order.[1]

## III. THE REGULATIONS

Encompassed by the legal challenges brought by the Tobacco Companies are regulations promulgated by the Attorney General under the title "Sales and Distribution of Cigarettes and Smokeless Tobacco Products in Massachusetts," (the "Tobacco Regulations"). 940 C.M.R. §§ 21.00–27.07. The Cigar Companies challenge the similar Regulations promulgated under the title "Sales and Distribution of Cigars in Massachusetts" (the "Cigar Regulations") 940 C.M.R. §§ 22.00–22.09.

## IV. TOBACCO REGULATIONS— FIRST AMENDMENT CHALLENGES

### A. The Tobacco Regulations

Neither the Tobacco Companies nor the Attorney General, for purposes of this motion, disputes the underlying goals of the Regulations in trying to curb underage smoking. The stated purposes of these regulations are to eliminate deception and unfairness in the way tobacco products are marketed and sold, in order to address the incidence of tobacco use by underage children. *See* 940 C.M.R. § 21.01. The pertinent portions of the regulations render the following advertising practices an "unfair or deceptive act or practice":

(a) Outdoor advertising, including advertising in enclosed stadiums and advertising from within a retail establishment that is directed toward or visible from the outside of the establishment, in any location that is within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school;

(b) Point-of-sale advertising of cigarettes or smokeless tobacco products any portion of which is placed lower than five feet from the floor of any retail establishment accessible to persons younger than 18 years old, which is located within a 1,000 foot radius of any public playground, playground area in a public park, elementary school or secondary school.

940 C.M.R. § 21.04(5)

The Cigar Regulations contain an identical provision, respecting "cigars" and "little cigars," to which the same First Amendment analysis applies.[2] *See* 940 C.M.R. § 22.06(5).

### B. First Amendment Issues

#### 1. The Standard of Review

 Despite the arguable lack of political or socially-useful content apart from

---

**1.** This Court previously has held, by order of December 2, 1999, *see Lorillard v. Reilly*, 76 F.Supp.2d 124 (D.Mass.1999), that 940 C.M.R. § 21.04(6), the portion of the Regulation prescribing "tombstone advertising," is preempted by federal law. This Court did not address the corresponding Cigar Regulation, 940 C.M.R. § 22.06(6): As cigar advertising *is not regulated by the Federal Cigarette Labeling and Advertising Act*, 15 U.S.C. §§ 1331–1342, and the Cigar Companies have

not, in any case, brought a motion based on preemption of 940 C.M.R. § 22.06(6), the "tombstone advertising" provision for cigars therein stands, subject to the resolution of the motions herein.

**2.** The Cigar Companies argue that their products deserve a different First Amendments analysis. The Court addresses this argument *infra*, section V.B.

product information, commercial speech has received First Amendment protection since the decision of *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Challenges to advertising regulations are typically analyzed under the framework established in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). That framework involves a four-part test:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343.

As a preliminary matter, the Tobacco Companies argue that a standard of review higher than that contained in *Central Hudson* should apply. *See* Pls.' Opp'n at 3. They argue that tobacco advertising that provides sale or brand information is not misleading or deceptive, does not incite children to smoke, and is already required to carry health warnings by operation of federal law. *See id.* In particular, the Tobacco Companies argue that their situation is analogous to that of the contraceptive advertiser in the case of *Carey v. Population Servs. Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), in which the Supreme Court held unconstitutional a New York state prohibition on any advertisement or display of contraceptives.

Notwithstanding the fact that the Tobacco Companies are advertising a legal commercial product, their analogy to *Carey* is misplaced. Their closest companions are pornographers, not those offering re-

productive services. *Carey* recognized that "where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Id.* at 686, 97 S.Ct. 2010. Smoking, like pornography, a type of legal recreational consumption enjoyed by millions of adults, has no readily discernable social or health benefits remotely comparable to contraception. Although smoking and pornography are arguably an important part of certain social circles, the "right" to smoke cannot be said to implicate constitutional rights as fundamental as does the "right" to determine reproductive decisions. *Cf. Griswold v. Connecticut* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (recognizing the constitutional right to be free from unwarranted governmental intrusion into the decision whether to bear or beget a child). The right protected in the instant case is the right to free speech relating to generic commercial products. *Carey* thus suggests that a court look to the social benefits of the advertised product when designating a standard of review for commercial speech restrictions. This additional check protects socially- or politically-important products from being unconstitutionally regulated through the back-door of advertising restrictions.

Some forms of advertising are particularly susceptible to constitutional concerns. With respect to the advertising restrictions in *Carey*, the Supreme Court recognized that their "can be no contention that the regulation is 'a mere time, place, and manner restriction.'" *Carey*, 431 U.S. at 700, 97 S.Ct. 2010. Unlike the instant Tobacco Regulations, the regulations in *Carey* were "total suppression" of all advertising, and concerned "activity with which, at least in some respects, the State could not interfere." *Id.* (quoting *Virginia Pharmacy Bd.*, 425 U.S. at 760, 96 S.Ct. 1817). The Supreme Court thus recognized that advertising regulations directed

toward a product whose actual availability itself implicates constitutional protections may be subject to high scrutiny, especially when those advertising regulations are "total suppression." In consequence, the State cannot easily, by regulating advertising, skirt the constitutional protections implicit in the product itself by imposing a ban on advertising and, in subsequent litigation, label those restrictions as merely regulation of "commercial speech." The underlying double set of implicated rights could, in certain circumstances, trigger the heightened scrutiny sought by the Tobacco Companies, but the case at bar does not sufficiently resemble *Carey* to warrant that standard. The Tobacco Regulations concern place and manner. They regulate a product whose principal use, like pornography, is recreational.

Consistent with his obligation to the Constitution, the Attorney General has presented, as will be discussed *infra*, valid justifications to regulate tobacco advertising. In *Carey*, the Supreme Court dismissed any notions that a ban on contraceptive advertising was justified by the State's contention that advertisements would be "offensive and embarrassing" or that they would "legitimize sexual activity of young people." With regard to the latter point, it is true that the Supreme Court ruled that none of the advertisements could "even remotely be characterized as 'directed to inciting or producing imminent lawless action and ... likely to incite or produce such action.'" *Id.* at 701, 97 S.Ct. 2010, (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 [1969]). The Tobacco Companies claim a similar lack of incitement in their advertising.

Hoping to draw a parallel to the advertisers in *Carey*, the Tobacco Companies argue that their advertisements "merely state the availability of products and services that are not only entirely legal [citation omitted], but constitutionally protected." *Id.* The last phrase of this passage from *Carey* is the key: the underlying activity in *Carey* had *particular* Constitutional protection. The Supreme Court's earlier citation to *Brandenburg v. Ohio* supports this emphasis. In *Brandenburg*, the underlying activity concerned the right to assemble with others in order to advocate action. *See Brandenburg*, 395 U.S. at 449, 89 S.Ct. 1827. The state law in *Brandenburg* criminalized certain instances of that behavior even in the absence of direct incitement, a law which obviously impacted on fundamental social and political freedoms. Smoking presents no such underlying constitutional concerns. Tobacco products are general, recreational, articles of commerce that are regulated and that may be regulated in many ways. The right to smoke exists only insofar as governments have allowed the products to be sold. The fact that cigarettes and other tobacco products are currently legal for adults does give rise to certain First Amendment constitutional rights to advertise those products, but those rights are completely delineated within the *Central Hudson* commercial speech framework. There is no compelling reason to apply a heightened standard.

### 2. First Amendment Analysis Under the *Central Hudson* Framework

Ultimately, in order for the Tobacco Regulations to be upheld against a First Amendment challenge, the Regulations must satisfy the four-part test expressed in *Central Hudson*. The first step of that analysis requires that the targeted speech qualify for constitutional protection. *See Central Hudson*, 447 U.S. at 566.

 Legitimate commercial speech is entitled to constitutional protections, but commercial speech that incites illegal activity may not be protected. The Attorney General does not concede that the targeted advertising qualifies for protection, since it might be seen to induce illegal activity. He is content to pass on that issue now, however, and to ask this Court to determine whether the regulations may stand, under the assumption that the advertising

is, indeed, qualified for protection. *See* Def.'s Mem. in Supp. at 5–6. Thus there are three remaining *Central Hudson* factors.

### a. Governmental Interest

Massachusetts, through various legislative and regulatory initiatives, has expressed an interest in reducing the number of underage smokers. The Attorney General argues that this governmental interest in addressing the incidence of underage tobacco use is substantial enough to meet the second part of the *Central Hudson* test. The Fourth Circuit in *Penn Advert. of Baltimore v. Mayor and City Council of Baltimore*[3], found that promoting compliance with the state prohibition of the sale of cigarettes to minors was a substantial governmental interest under *Central Hudson.*

Attempting to support the contrary conclusion, the Tobacco Companies point to *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). In *44 Liquormart*, the Supreme Court found that a state ban on liquor price advertising was unconstitutional. That case does not inform this Court's analysis, however, because it concerned the imposition of a "vice" characterization of alcohol with respect to adult consumers. *See id.* at 513–14, 116 S.Ct. 1495. The Attorney General's intention here is to target the prevalence of an illegal activity—

underage smoking—not to restrict information from reaching adult smokers or to place a "vice" label on smoking.[4] This Court agrees with the Fourth Circuit that a state has a substantial interest in promoting compliance with one of its own valid laws.[5] The Commonwealth's interest in this case is substantial enough to meet the second prong of the *Central Hudson* test.

### b. Directly Advancing the Government Interest

No governmental interest, however strong, can justify legislation that "misses the mark." The third prong of the *Central Hudson* test requires a showing that the challenged regulation directly advances the governmental interest asserted. *See Central Hudson*, 447 U.S. at 566, 100 S.Ct. 2343. This requirement may be satisfied by the submission of surveys, studies, and even anecdotal evidence. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 627–29, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). In certain cases, even "history, consensus, and 'simple common sense'" can be used to support the finding that the regulation advances the governmental interest. *Id.* at 628, 115 S.Ct. 2371 (quoting *Burson v. Freeman*, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) ).

The Attorney General cites cases finding a common-sense connection between pro-

---

**3.** 63 F.3d 1318, 1326 (4th Cir.1995), *vacated* 518 U.S. 1030, 116 S.Ct. 2575, 135 L.Ed.2d 1090 (1996), *modified*, 101 F.3d 332 (4th Cir. 1996), *cert. denied*, 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 715 (1997).

**4.** *44 Liquormart* is further distinguishable in that it involved a complete statutory ban on price advertising, a characteristic that appears to have concerned the Supreme Court greatly. *See id.* at 502, 504, 116 S.Ct. 1495. That point goes to the tailoring of the law, however, and not the initial question of governmental interest. The Supreme Court appears to have had no trouble in recognizing a state interest in reducing alcohol consumption, the stated purpose of the statute.

**5.** This interest is particularly high where the goal is to protect children who may not be able to assess the nature of the messages contained in the advertising. *See Anheuser–Busch, Inc. v. Schmoke*, 101 F.3d 325, 329–30 (4th Cir.1996), *vacated*, 517 U.S. 1206, 116 S.Ct. 1821, 134 L.Ed.2d 927 (for reconsideration in light of *44 Liquormart* ), *on remand*, 101 F.3d 325 (1996) (reaffirming original ruling), *cert. denied*, 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 714. Indeed, this is an area where tobacco advertising and pornography bear a striking similarity, as governments try to shield children from adult-targeted expression. *Cf. Ginsberg v. New York*, 390 U.S. 629, 639–40, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (upholding law prohibiting sale of obscene materials to minors).

motional advertising and consumption. *See* Def.'s Mem. in Supp. at 8. He also cites reports of the Surgeon General, the Food and Drug Administration, and the National Academy of Sciences' Institute of Medicine specifically linking advertising exposure to underage smoking, *see id.* at 9, and relies upon many government, scientific, empirical, and academic reports that support the use of advertising restrictions to decrease youth smoking. *See id.* at 10–12. These submissions are more than sufficient under the *Central Hudson* analysis. "[W]e do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by references to studies and anecdotes pertaining to different locales altogether." *Florida Bar*, 515 U.S. at 628, 115 S.Ct. 2371.

In *Penn Advertising*, the Fourth Circuit analyzed regulations similar to the ones here and ruled that there was a "logical nexus" between advertising restrictions and the interest in reducing underage smoking. 63 F.3d at 1326. The Tobacco Companies argue that they advertise to influence consumers' brand preference and to persuade consumers to change brands.[6] Common sense informs this Court, however, that tobacco advertising must play some logical role, even if not a primary one, in the total amount of smoking. By way of comparison, it is not unusual to see advertisements for products or services even though the advertiser has a de facto monopoly. For example, the familiar advertisements by DeBeers encouraging the purchase of diamonds can hardly be construed as intended to convince customers to change brands, because there are essentially no competing brands. *See* Anthony DePalma, *Diamonds in the Cold; New Canadian Mine Seeks Its Place in a De-Beers World*, N.Y. Times, Apr. 13, 1999, at C1 (noting the diamond "cartel's tight grip on the market"). Rather, the advertisements remind consumers of the represented benefits of the product and encourage further purchases.[7] Studies, including those presented by the Attorney General, reach the same conclusion with more scientific precision. "[R]esearch has confirmed that 'tobacco advertising plays an important role in encouraging young people to [smoke].'" Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence of Market Manipulation*, 112 Harv.L.Rev. 1420, 1508 (1999) (quoting John P. Pierce, Lora Lee & Elizabeth A. Gilpin, *Smoking initiation by Adolescent Girls, 1944 Through 1988: An Association with Targeted Advertising*, 271 JAMA 608, 611 [1994]).

■ The Tobacco Companies challenge the sufficiency of the Attorney General's showing in several ways. They first argue that the studies upon which he relies were not submitted with sworn expert affidavits, are therefore inadmissible, and cannot support the *Central Hudson* analysis. *See* Pls.' Opp'n at 6. This evidentiary point is weak. The government reports are admissible as government documents. *See* Fed. R.Evid. 803(8)(c); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). As to the other reports, the *Central Hudson* inquiry centers on whether the government had a logical belief, when it crafted the regulation, that its regulation would directly advance its

6. If true, the Tobacco Regulations ought not harm the industry as a whole, because all competitors will be equally restricted from certain forms of advertising. If the economic impact to the industry as a whole is negligible because advertising affects solely brand preference (and not total consumption), it begs the question why the tobacco industry would pursue costly litigation which only preserves

for them the ability to woo customers from each other.

7. This is particularly true of point-of-sale advertising, where consumers may be reminded to purchase an extra pack of cigarettes even if their original trip to the store was only for milk.

purpose.[8] *See Penn Advertising*, 63 F.3d at 1323. The government need not limit its legislative acts to those based only on evidence which would later be admissible at any potential trial. The existence of the studies demonstrates, from the point of view of the Commonwealth while legislating or regulating, a sufficient connection between advertising and youth smoking.

The Tobacco Companies next argue that the Attorney General has relied too much on common sense and reason to satisfy the third prong of *Central Hudson*. *See* Pls.' Opp'n at 7–8. They argue that brand advertising has the effect of reallocating demand among competing suppliers, and does not increase aggregate demand. They assert that the Attorney General's speculation that a restriction on advertising will lower primary demand is insufficient. The Attorney General has indicated, however, that the Regulations also promote the purpose of reducing the number of *current* underage smokers by lowering their exposure to advertisements. Thus a determination of whether primary demand, per se, is affected is not required, although it has been addressed *supra*.

Several studies, and common sense, show a link between advertising and smoking. The Regulations attempt to restrict advertising in and around the places most traveled by children. The Attorney General has thus shown, through both studies and common sense, that the Regulations will have a direct effect on underage smoking.

The remainder of the Tobacco Companies' attack on this prong consists of a challenge to the accuracy or conclusions of the studies themselves. *See* Pls.' Opp'n at 8. They assert that there is no evidence that advertising is the sole cause of underage smoking, and point out that many other factors influence a teenager to smoke. They cite weaknesses in the Attorney General's studies for the proposition that there is no conclusive proof that tobacco advertising causes people to smoke. Using these doubts as evidence of a lack of connection between advertising and smoking, the Tobacco Companies point out that in *Florida Bar*, the opponents to the regulation presented no data or evidence to contradict that presented by the government. Furthermore, they argue, a court is not free to speculate or choose among competing experts or to defer to the legislature in the absence of an adequate factual record. *See* Pls.' Opp'n at 11. Here, however, unlike the *44 Liquormart* case to which Tobacco Companies cite, there is a solid body of research demonstrating a link between advertising and incidence of smoking. The Attorney General has reacted to that evidence in addressing the problem of underage smoking by targeting forms of advertising which are in proximity to children. The question that emerges is what level of evidence the Commonwealth would need in order to legitimate, under the Constitution, its legislative or regulatory decisions.

■ The government is not required to satisfy the causal relationship by a preponderance of the evidence. "The inquiry under *Central Hudson*'s third prong—whether the regulation directly advances the stated interest—does not involve as strict a nexus as that inherent in the traditional tort concept of causation. Rather, the inquiry seeks to elicit whether it was reasonable for the legislative body to conclude that its goal would be advanced in some material respect by the regulation." *Anheuser–Busch*, 63 F.3d at 1313.

If it appear to the court that the legislative body could reasonably have believed, based on data, studies, history, or common sense, that the legislation would directly advance a substantial governmental interest, the government's burden of justifying it is met. [Citation omitted] The determinative question in

---

**8.** In this sense, *Central Hudson* seems to remove such reports from classification as hearsay at all, since the reports are not submitted for the truth of their statements, but rather as evidence of the effect of those statements on the legislating body.

reviewing a facial challenge to an ordinance thus is whether the legislative body acted with the objectively reasonable belief that the means it selected fit the objective sought. The issue is not whether the substantive findings on which it relied are incontrovertibly true. *Penn Advertising,* 63 F.3d at 1323.

This case is unlike those in which the government has failed to satisfy the third *Central Hudson* prong by failure to submit *any* credible evidence of direct advancement. *See, e.g., Rubin v. Coors Brewing Co.,* 514 U.S. 476, 490, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (government "did not offer any convincing evidence"); *Edenfield v. Fane,* 507 U.S. 761, 770–1, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (not satisfied if based on "mere speculation or conjecture"). The Attorney General has provided substantial evidence showing that regulation of tobacco advertising would substantially advance its interest in curtailing underage smoking. This relationship satisfies the third prong of *Central Hudson.*

 c. Not More Extensive Than is Necessary to Serve the Government Interest

The final part of the *Central Hudson* analysis requires the court to examine whether the challenged Regulations restrict speech in a manner that is more extensive than necessary to serve the governmental interest. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. The fit need not be perfect, but it should be reasonable, something "short of a least-restrictive-means standard." *Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 475, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). The Supreme Court has adopted, derived from "time-place-manner" restriction doctrine, a "narrow tailoring" standard in which the regulation should not burden substantially more speech than is necessary to further the government's legitimate interests. *Greater New Orleans Broadcasting Assoc.,*

*Inc. v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 1932, 144 L.Ed.2d 161 (1999). This means "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* (quoting *Fox,* 492 U.S. at 480, 109 S.Ct. 3028). The Supreme Court is "loath to second-guess the Government's judgment to that effect." *Fox,* 492 U.S. at 478, 109 S.Ct. 3028.

The Attorney General argues that the Regulations are discrete and targeted because they apply only within 1000 feet of schools and playgrounds, and to low-level advertising inside stores. They do not affect other forms of advertising, such as direct mail or newspapers. They also do not resemble complete-speech regulations, which have failed this prong of *Central Hudson,* involving complete bans on price advertising of alcohol or prescription drugs, or broad prohibitions on advertising by lawyers. *See, e.g., 44 Liquormart,* 517 U.S. at 484, 116 S.Ct. 1495; *Bates v. State Bar of Arizona,* 433 U.S. 350, 365, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Virginia Bd. of Pharmacy,* 425 U.S. at 770, 96 S.Ct. 1817.

The Attorney General also asserts that there are no obvious less burdensome alternatives to the challenged Regulations. He points out that there is already a large, sustained effort in Massachusetts to reduce the illegal purchase and use of tobacco by minors. This effort, however, has not significantly lowered the rate of underage tobacco use. *See* Def.'s Mot. at 18. The government believes that targeting the development and maintenance of the desire of children to use tobacco through the regulation of advertisements is a reasonable next step in trying to address the problem.

In response to these points, the Tobacco Companies first challenge whether a restriction on speech itself is narrowly tailored to suit the objectives, in light of alternatives. They point out that there is "a wide array of alternatives" that could be

implemented instead of a restriction on speech. Those alternatives include more rigorous enforcement of illegal sales, licensing supervision, prohibiting the possession of tobacco by minors, educational programs, and counter-advertising. *See* Pls.' Opp'n at 13–16. Certain Supreme Court decisions have found persuasive weight in the existence of alternatives when deciding whether a law is narrowly tailored to suit governmental interest. *See Greater New Orleans Broadcasting,* 527 U.S. at ——, 119 S.Ct. at 1934 ("There surely are practical and nonspeech-related forms of regulation—including a prohibition or supervision of gambling on credit; limitations on the use of cash machines on casino premises; controls on admissions; pot or betting limits; location restrictions; and licensing requirements—that could more directly and effectively alleviate some of the social costs of casino gambling."); *44 Liquormart,* 517 U.S. at 486, 116 S.Ct. 1495 ("It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the state's goal of promoting temperance."); *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417 n. 13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) ("if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable"). These cases are distinguishable, however.

In *Greater New Orleans,* the regulation prohibited advertising by private casinos, and thus, more severely impacted casinos run by non-Indians than those run by Indian tribes. The Supreme Court found that this kind of regulation, based on the identity of the owners or operators of the casino, was not tailored to the purpose of reducing the incidence of gambling. In *44 Liquormart,* the government banned the advertising of alcohol prices in an effort to promote temperance. There was no showing that other methods, such as a direct price increase, would not also have promoted

temperance. Nor did the government show that the restriction would materially advance the government interest (the third prong of the *Central Hudson* test). In *Discovery Network,* the ordinance involved prohibited distribution of "commercial handbills" in order to remove certain news racks from city streets. This method of indirectly targeting certain newsstands did not suit the interest in "ensuring safe streets and regulating visual blight" in Cincinnati. Thus a more direct regulation concerning size, shape or location of the stands, rather than a ban on the stands based on the content of their materials, would be a far better fit.

The Attorney General has indicated, and it is undisputed, that numerous efforts are and have been underway to combat underage smoking. These include education, enforcement, and counter-advertising. *See* Def.'s Mot. at 18. They have been recognized as some of the leading programs in the country. *See* Def.'s Reply at 13. Although they have had some effect, underage smoking still remains a problem in Massachusetts. Although these efforts could be expanded infinitely, the Attorney General has shown that advertisements have a relationship to underage smoking, making a regulation of that form of speech potentially sufficiently tailored to meet the government objective in satisfying Constitutional requirements. All he needs show is a reasonable "fit" to the underlying goal. See *Greater New Orleans Broadcasting,* 527 U.S. at ——, 119 S.Ct. at 1932.

There will always be alternatives to regulating speech. Almost any restraint made on speech could have, alternatively, a corresponding restraint on action that the speech is designed to curtail. This cannot mean that every social problem that can be addressed both by direct legislation controlling the act and by indirect legislation regulating the communication of information related to the act must be pursued by direct legislation regulating the underlying action to the point of exhaustion. It is up

to the legislature to decide what combination of restraints best addresses its interest, so long as the restraint on speech is narrowly tailored to address that interest.

This Court is unpersuaded that the Commonwealth cannot, at all, use speech-targeting restrictions until a "myriad of alternatives" is tried and found wanting. In the context of underage smoking, that rule would delay the government in using what may very well be a most effective way to prevent teenagers from starting smoking and becoming addicted to nicotine. In light of the marginal success of all its various other initiatives, an initiative targeting advertising is capable of being narrowly tailored to the interest in reducing underage smoking. The question that remains, of course, is whether the Regulations are so tailored.

The Tobacco Companies argue that even if some restriction on their speech is permissible, the Attorney General's specific Regulations are more extensive than necessary. In particular, they claim the 1000–foot radius surrounding schools and playgrounds is too large, and the 5–foot restriction on indoor advertising within that 1000–foot zone is illogical. *See* Pls.' Mot. at 18.

The Tobacco Companies submit affidavits showing that the zones envisioned by the challenged Regulations would cover between 87 and 91 percent of the land areas in the cities of Boston, Worcester and Springfield.[9] *See* Pls.' Mot. at 18 n. 19. This effectively bans nearly all outdoor advertising, and captures nearly all retail establishments in those cities.

The resulting dilemma should appear quite obvious. If the government were to expand this zone to an extremely large radius surrounding schools and playgrounds (let us say, for sake of argument, 5 miles), the zone would become meaningless. It might cover the entirety of the Commonwealth without acknowledging that it is a total advertising ban inherently achieving a different or additional governmental purpose. If the Attorney General claims to be protecting children from being encouraged to smoke, his Regulations must be in some way narrowly tailored to apply to the exposure of *children* to tobacco advertisements. Using the articulated legitimate government purpose of protecting children to uphold a regulation which effectively shields *everyone* from viewing tobacco advertising would be improper[10] and would seemingly violate the final prong of the *Central Hudson* test. The regulations must not "burden substantially more speech than necessary." *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 430, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). The government must show, somehow, that the decision to choose 1000 feet as the target zone is narrowly tailored to effectuate the governmental purpose.[11]

9. The methodology of some aspects of this analysis is challenged by the Attorney General, *see* Def.'s Resp. at 17 n. 19, but the point remains that the restriction is extensive.

10. The question of whether shielding all persons from viewing tobacco advertisements is a legitimate government interest properly addressed by the Regulations is not at issue in this case, and this Court declines to address it.

11. Just prior to the release of this Memorandum and Opinion, this Court received a letter from the Attorney General indicating certain amendments to the Regulations. *See* Letter from William W. Porter, Jan. 19, 2000. The pertinent part of the amendments removes the text in 940 C.M.R. §§ 21.04(5)(b) and 22.06(5)(b) which reads "accessible to persons younger than 18 years old" and replaces it with "which is not an adult-only retail establishment." *See id.*, Attachment A. "Adult-only retail facility" (the Court assumes the mismatch is unintentional) is defined as "a facility where the retailer ensures that no person younger than 18 years old is present or permitted to enter at any time." This amendment clarifies the provision by replacing the vague word "accessible," and tailors the regulation by exempting establishments where children are unlikely to enter. It does not, however, address the issue of the permissible zone of regulation for all the establishments that are *not* "adult-only." The Court's concern regarding the 1000–foot zone continues.

At oral argument, the Attorney General agreed with the Tobacco Companies' speculation that the choice of a 1000–foot zone was based on tobacco billboard advertising restrictions developed by the Food and Drug Administration (the "Administration").[12] *See* Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco Products to Protect Children and Adolescents, 60 Fed.Reg. 41,-334–335, 41,374 (1995) (to be codified at 21 C.F.R. § 897.30(b)) (proposed Aug. 11, 1995). The 1000–foot restriction derived originally from the Administration's proposed regulations on tobacco advertising is now rendered moot in Massachusetts by virtue of the settlement agreement reached in 1998 between the industry and 46 states.[13] The Tobacco Companies argue, and the Attorney General seemed not to disagree at oral argument, that the 1000–foot restriction was based on the Administration's analysis of the visibility of large billboards. While it may be true that the Massachusetts settlement resulted in a "voluntary" ban of billboard cigarette advertising, an examination of the proposed federal regulations shows that the Administration contemplated *all* forms of outdoor advertising. The Massachusetts settlement may have rendered the applicability of that regulation moot with respect to *billboard* advertising, but the settlement does not narrow the intended scope of the contemplated federal regulations as expressed in the text of the regulation itself.

The text accompanying the Proposed Rule uses the general term "outdoor advertising". *Id.* at 41,315, 41,334, 41,357. Furthermore, the text of the proposed regulation itself explicitly includes many forms of advertising: "No outdoor advertising, including but not limited to billboards, posters, or placards, may be placed within 1,000 feet of any playground, ele-

mentary school or secondary school." *Id.* at 41,334–335, 41,374 (to be codified at 21 C.F.R. § 897.30(b)). The Administration notes that "[t]hese are places where children and adolescents spend a great deal of time and should therefore be free of advertising for these products. The agency believes that this [is] a reasonable restriction." *Id.* at 41334.

Of course, any numerical limit bears some degree of arbitrariness. It is not the role of the Courts to choose the proper number for the legislature in order to make the Regulations valid. The government must show it has narrowly tailored its regulation to effectuate its purpose. A numerical limitation selected with no particular logical rationale is insufficient to meet this burden, especially when that limit exhibits a real danger of swallowing up everything by being *de facto* no limit at all.

Here, however, the Attorney General has relied on the conclusions of a federal agency engaged in the very same objective: the protection of children from tobacco products. The Administration selected 1000 feet as the appropriate zone, and described that zone as inclusive of places where children spend a lot of time. This Court will not second-guess the Attorney General's decision to rely on the Administration's conclusions in selecting the numerical limit of a zone of regulation.

That reliance, however, must be seen to relate to substantially the same subject matter. Although the Administration's proposed regulations address all forms of *outdoor* advertising, they do not address *indoor* advertising in stores near schools or playgrounds. It may seem to be common sense to conclude that children frequent stores within the areas in which they spend the most time. But there is a perceptible difference between places where

---

**12.** "[W]here we got the thousand feet quite simply is that's what the FDA determined." Tr. of Mot. Hr'g, Dec. 2, 1999 at 5.

**13.** The settlement agreement resolved the lawsuit of *Massachusetts v. Philip Morris Inc.*

*et al,* No. 95–7378–J (Sup.Ct.Mass.1998). As part of the settlement of that case, the Tobacco Companies are now contractually barred from billboard advertising.

children simply *travel* as they go to school or to the playground, and the interior of places where they choose to spend their money. The former involve areas in which children are unlikely to exercise voluntary control because they are merely observing advertisements on the way to their usual destination. It is also likely to be a daily, repetitive exposure of a long duration. The latter situation is an actual destination of a child with a purpose in mind—to spend money. The transaction is occasional and brief, but it occurs at the vulnerable moment of a commercial transaction, at the situs where cigarettes are actually sold. Whether these (or other) differences are significant is *not* for this Court to decide. It is enough that the rationale pointed to by the Attorney General for selecting a 1000–foot perimeter fails to indicate narrow tailoring with respect to retail stores containing *indoor* advertisements. The Administration never delineated what the proper zone would be, if any, for regulation of *indoor* advertisements in stores near schools or playgrounds.

The Tobacco Regulations therefore pass the four-part *Central Hudson* test with the exception of 940 C.M.R. § 21.04(5)(b), the provision relating to point-of-sale advertising. The Attorney General has failed to demonstrate that 940 C.M.R. § 21.04(5)(b) is "not more extensive than is necessary to serve the government interest" because its sole justification for the selection of a 1000–foot zone relates to conclusions by a federal agency concerning *outdoor* advertising. For the same reason, the companion Cigar Regulation at 940 C.M.R. § 22.06(5)(b) cannot stand.

Under 940 C.M.R. § 21.06 (and the Cigar Regulations' companion § 22.08), the point-of-sale advertising provision can be severed from the rest of the regulations. The outdoor advertising restrictions in 940 C.M.R. § 21.04(5)(a) thus stand.

## V. ANALYSIS RELATING TO CIGAR REGULATIONS

### A. The Cigar Regulations

The Attorney General and the Cigar Companies have filed cross-motions for summary judgment testing the validity of provisions in the Cigar Regulations imposing warning label requirements on cigar packaging and advertising, and advertising restrictions paralleling the Tobacco Regulations. These Cigar Regulations express a purpose similar to the Tobacco Regulations, with the additional aspiration that

Massachusetts consumers may be adequately informed about the health risks associated with cigar smoking, its addictive properties, and the false perception that cigars are a safe alternative to cigarettes by requiring the cigar industry to include health warnings on the package labels of cigars sold and distributed within Massachusetts and in the advertisements of such products within Massachusetts . . .

940 C.M.R. § 22.01.

### B. First Amendment Challenge to the Advertising Provisions of the Cigar Regulations

In addition to echoing the First Amendment argument advanced by the Tobacco Companies, the Cigar Companies argue that cigars are distinguishable from cigarettes and that this distinction entitles their products to a differential First Amendment analysis.

The Cigar Companies point out several differences between the cigar market and the cigarette market. *See* Pls.' Opp'n (Cigar Warnings) at 3–5. By way of summary, the main points are that (i) the cigarette manufacturers spend over 100 times more on advertising than do the cigar companies; (ii) the Food and Drug Administration, in 1996, decided not to include cigars in its regulation of tobacco because of insufficient evidence of use by children or adolescents; (iii) the cigar companies do not use billboards and engage in

relatively little magazine and newspaper advertising; and (iv) cigars involve a "tactile interaction" at the point of sale in which consumers like to feel, smell, and look at the quality of the cigar prior to purchase. *See id.*

The crux of the Cigar Companies' argument about product distinctions falls on parts three and four of the *Central Hudson* test, outlined *supra.* Namely, the argument implicates the questions of whether the regulation advances the governmental interest and whether the regulation is not more extensive than necessary.

1. Advances the Governmental Interest and is No More Extensive than Necessary

■ The Cigar Companies argue their products are materially distinguishable from cigarettes because of the different nature of the cigar market.[14] The Attorney General has imposed upon them the burdens of advertising regulations in the absence, they argue, of any evidence that cigar advertising increases youth consumption of cigars.

■ If the Attorney General has no evidence at all to support a link between advertising and underage *cigar* smoking, it would seem that the Cigar Companies' argument is valid. That is to say, where a product subject to advertising regulations is related to but materially distinguishable from a product whose advertising is legitimately regulated, the Attorney General must show, under *Central Hudson,* how regulation of the distinguishable product also materially advances the governmental interest. If, however, the products lack material differences, it is appropriate that

the Regulations cover both without a separate First Amendment analysis.

The Cigar Companies claim that there is no logical reason to believe that the Cigar Regulations will reduce youth access to cigars, and no studies so finding. Thus, they argue, the portions of the Cigar Regulations related to indoor and outdoor advertising, 940 C.M.R. § 22.06(5)(a) and (b), fail to satisfy the third and fourth parts of *Central Hudson* because the Regulations do not advance the governmental interest.

The Attorney General's response is that there is sufficient evidence for the Regulations to treat cigarettes and cigars alike. *See* Def.'s Mem. (Cigar Warnings) at 2. The similarities between the products pointed out by the Attorney General relate to chemistry, disease consequences, trends in consumption, and marketing practices. It is, of course, unlawful for minors to purchase cigars. It also seems fairly clear that the toxicity and disease consequence of cigars are similar to that of cigarettes, invoking a similar underlying governmental interest in regulating youth consumption.[15] The Attorney General claims that data, more recent than those cited by the Cigar Companies, show alarming rates of youth cigar use and an increase in youth cigar use. *See id.* at 4–6. Furthermore, the Cigar Companies' efforts to promote cigars as symbols of success, elegance, and athleticism create a risk that children will find the advertisements increasingly appealing, especially in light of the lower number of visible cigarette advertisements. *See generally* the glossy magazines *Cigar Aficionado* and *Smoke.* The editorial policies of each promote cigar smoking as the path to "the good life" and a "distinctive lifestyle." According to the Attorney Gen-

---

**14.** Unfortunately, the familiar adage attributed to Sigmund Freud that "sometimes a cigar is just a cigar" does not instruct this Court on whether a cigar is ever a like a cigarette for purposes of the First Amendment.

**15.** The Attorney General does not have to establish a link between smoking and health

to survive First Amendment scrutiny. The true relevant analysis is that the purchase of cigars is unlawful for minors and thus the government has an interest in promoting compliance with that law. The Regulations must advance the governmental interest in promoting compliance.

eral, the Federal Trade Commission found that cigar advertising increased by 32 percent in the two-year period from 1996 through 1997. *See* Def.'s Mem. (Cigar Warnings) at 4. A 1996 survey shows that 26.7 percent of fourteen to nineteen year-olds had smoked at least one cigar in the preceding year. *See id.* It is logical for the Attorney General to accept the proposition that cigar advertising has similar effects on underage smoking as cigarette advertising, even though there have been fewer studies so to demonstrate. The last thing the Attorney General would desire is to shift children from purchasing cigarettes to purchasing cigars by allowing the growth of cigar advertising in place of cigarette advertising. Although the increase in cigar smoking may be a passing "trend," as suggested by the Cigar Companies at oral argument, the Commonwealth can respond to that trend or take action *either* to further its demise or prevent its recurrence. There is thus support for treating the cigars as indistinct from cigarettes.

Additionally, the Cigar Regulations can be supported on the rationale that the cigars, even if distinguishable, are separately subject to regulation under *Central Hudson* because they create an interest by minors to which the Attorney General has responded with an effective and narrowly-tailored regulation. It seems reasonable to this Court for the Attorney General to be concerned about youth consumption of cigar tobacco in the same way it is concerned about cigarette tobacco. The Attorney General should not have to wait until there is a new epidemic of underage cigar smokers in order to enact regulations intended to prevent that very epidemic. Cigars may not be as popular as cigarettes, but they are just as illegal for minors to purchase, and they, therefore, carry just as much of a government interest as cigarettes. The differences may be akin to those among beer, liquor, and wine. Although underage drinkers may prefer beer and liquor to wine, that does not call for a differential First Amendment treat-

ment of regulations restricting advertising of those products. Nor would the connoisseur aspect of wine or its more upscale advertising methods cause this Court to ignore it as an alcohol product. So, too, cigars. Given the showing of a legitimate reason to roll cigars into the comprehensive but tailored plan to combat underage smoking, this Court will not second-guess the wisdom of the Attorney General's decision to act now. This Court concludes that to the extent that they materially differ in nature, cigars and cigarettes are so interrelated and implicated in the same governmental interest as to be capable of identical regulation.

As this Court rules that cigars and cigarettes are indistinguishable for the purposes of First Amendment advertising protection, the *Central Hudson* analysis is the same as that for cigarettes. The remaining parts of the *Central Hudson* test are analyzed, and the conclusions reached, in the same manner as they were for the other tobacco products. Consequentially, the Attorney General has satisfied the *Central Hudson* factors in all but one area. He has not demonstrated that the Commonwealth's regulation of *indoor* point-of-sale advertising is no more restrictive than necessary. The selection of the 1000–foot zone around schools and playgrounds cannot be supported by a contemplated federal regulation relating to *outdoor* advertising. *See* discussion *supra* Part IV.B.2.c. Section 22.06(5)(b) is therefore invalid.

### 2. Restrictions on Retail Practices

■ The Cigar Companies' have also expressed First Amendment concerns regarding the physical location of cigars in stores. These concerns are not properly examined under a First Amendment analysis because they do not implicate speech or expression.

First, the Cigar Companies lament the prohibition of self-serving displays of cigars by 940 C.M.R. § 22.06(2)(c). In the context of cigarette sales, self-service dis-

plays are not advertisements whose speech or expression is protected. *See Rockwood v. City of Burlington,* 21 F.Supp.2d 411, 420–21 (D.Vt.1998). So, too, cigar self-service displays. It is irrelevant that cigars come in different varieties or that some customers like to handle the cigars before purchasing them. These are characteristics of the commodity itself, not indications that protected expression exists. Stores are already in the practice of keeping certain tobacco products behind the counter. If cigars must likewise be locked up or placed out of reach as a result of these regulations, that cannot properly be said to pose First Amendment problems distinguishable from those occasioned by restrictions on cigarette sales practices. Although aroma, feel, and look may be important "information" for cigar consumers, that information is neither speech nor expression. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (where a village regulated sale of items near display of literature encouraging illegal use of drugs, "the village [did] not restrict speech as such, but simply regulate[d] the commercial marketing of items"). For consumers seeking that information, cigars may be examined on request at the store. Furthermore, the fact that many cigars are today mass-packaged without ability for individual examination makes this argument mostly spurious.

Second, the Cigar Companies also object to the ban on cigar sampling and promotional give-aways located at 940 C.M.R. § 22.06(1)(a). This restriction arguably may hinder channels of "communication" to adult consumers by depriving them of the information contained within the product itself. That argument is flawed. If accepted, the argument would implicate every commercial transaction regulation in the country in a First Amendment analysis because any sale or give-away of a product inherently conveys information about that product itself. This is simply a misreading of the reach of the First Amendment. The restrictions on sales restrictions at § 22.06(1) and (2) are valid.

C. Challenges to the Cigar Warning Requirements

1. The Relevant Cigar Regulations

The Cigar Regulations require that packages of machine-made cigars and cigar advertising carry warnings that cigars are not a safe alternative to cigarettes and that cigar smoke contains carbon monoxide and nicotine (the "Warnings"). *See* 940 C.M.R. §§ 22.04–22.05. The Attorney General has asked for summary judgment declaring that the Warnings do not violate the First Amendment and the Commerce Clause. The Cigar Companies have filed a cross-motion for summary judgment on the same grounds.

The Attorney General has extensively outlined the health risks of cigars and the growing popularity of cigars in his memorandum. *See* Def.'s Mot. (Cigar Warnings) at 3–5. The Warnings are intended to fill in the gap in federal health warnings, which apply only to cigarette and smokeless tobacco packages, and to provide consumers with information about the dangers of cigar smoking. These Warnings must occupy 25% of the front or top panel of the package (whichever is larger) in clear and conspicuous black-and-white print. *See* 940 C.M.R. § 22.04(2). The 25% warning allocation space may also be used for any federal, state or local warnings that may be required, so long as the Massachusetts warnings remain clear and conspicuous. *See* 940 C.M.R. § 22.04(2)(b). The regulations also require 20% of any cigar advertisement to include the Warnings. *See* 940 C.M.R. § 22.04(2). The use of a pre-printed sticker affixed to the package or advertisement constitutes compliance. *See* 940 C.M.R. § 22.04(2)(b).

2. First Amendment Analysis

■ The Attorney General argues that the Warning provisions do not violate the First Amendment. Product disclosure and

warning requirements are generally upheld if they are reasonably related to the state's interest in preventing deception of consumers. *See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). "Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides [citation omitted] [the] constitutionally protected interest in *not* providing any particular factual information in [ ] advertising is minimal." *Id.* at 651, 105 S.Ct. 2265. The Attorney General points out that consumer product warnings are commonplace and have long served to inform consumers of the risks of such products as cigarettes, alcohol, prescription drugs, pesticides, raw milk, and hazardous substances. Citing cases that have upheld such warnings, the Attorney General asserts that the Warnings are reasonable and require no further scrutiny under the First Amendment. *See Def.'s Mem.* (Cigar Warnings) at 8–9. Since it is the regulation that declares the cigar advertisements "unfair or deceptive," rather than any particular words in the advertisements themselves, this argument is too superficial to resolve the issue.

The Attorney General continues with a *Central Hudson* analysis in which he argues that the Warnings' requirement satisfies all four prongs of the test.[16] It seems clear that the health effects of cigar smoking on Massachusetts consumers are a substantial state interest, easily satisfying the second *Central Hudson* prong.

Mandatory labeling warnings seem particularly suited to advancing the state interest in informing consumers of hazards, because they are delivered at the point of consumption. Courts have, therefore, found the third prong of *Central Hudson*

easy to satisfy in the context of product warnings. *See In Re R.M.J.,* 455 U.S. 191, 201, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982); *Bates v. State Bar of Arizona,* 433 U.S. 350, 375, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) ("the preferred remedy is more disclosure, rather than less"). *Central Hudson* itself suggested that it might be permissible to "require that advertisements include information about the relative efficiency and expense of the offered service." 447 U.S. at 571, 100 S.Ct. 2343.

The Cigar Companies advance several reasons for why they believe the Warnings will not advance the governmental interest. These include the argument that the labels will be ignored over time and will not be visible behind the counter. Furthermore, one aspect of the Warnings' text[17] advises consumers about the ingredients of cigar smoke but does not directly inform anyone whether or not cigar smoking is addictive or dangerous. The Cigar Companies argue that these warnings cannot further the governmental purpose in warning consumers about the dangers or addictive properties of cigar smoke because they do not identify any specific risks associated with cigars. This argument is disingenuous—it suggests that the Cigar Companies would support warning language that more clearly condemns their products, warnings which directly assert the dangers of cigar smoke, rather than a requirement merely to list important ingredients.

The argument is unpersuasive, in any event. The first warning alerts the consumer to important contents of cigars, one of which (nicotine) is an "addictive drug" and the other of which (carbon monoxide) is commonly known to be hazardous. The other indicates the danger of cigars by comparing them to cigarettes, the dangers of which many consumers already know.

---

**16.** The first prong, eligibility for protection, he seems to admit or ignore. Since cigars are legal, this Court assumes their packaging and advertising is also legal and thus protected.

**17.** The Warnings require rotation of the following two statements: "WARNING: Cigar Smoke Contains Carbon Monoxide And Nicotine, An Addictive Drug" and "WARNING: Cigars Are Not A Safe Alternative To Cigarettes Or Smokeless Tobacco Products."

These advance the governmental interest in consumer knowledge and awareness of the nature of cigars. The Cigar Companies' semantic quibbles are not persuasive. It is not necessary that the government pick the absolute most effective warning text for a package to pass this prong of *Central Hudson*. Rather, the government must select some language which directly advances its interest. Here, it has done so. The Warnings' requirement satisfies the third prong of *Central Hudson*.

The Attorney General next argues that the Warnings' requirement comports with the final prong of the *Central Hudson* analysis by being narrowly tailored to serve the governmental interest. He bases this argument on the fact that the Warnings do not limit speech but rather provide important additional information in a place noticeable by the consumer. *See* Def.'s Mem. (Cigar Warnings) at 13. He provides several examples of how the law is tailored to suit its objectives. The Warnings are formatted to be simple and easy to see. They cover only 25% of one side of the package (or 20% of advertisements). *See* 940 C.M.R. §§ 22.04(2), 22.05(2). The Warnings do not apply to hand-rolled cigars. *See* 940 C.M.R. §§ 22.03, 22.04. The warning area may be allocated to other required warning uses. *See* 940 C.M.R. § 22.04(2)(c). A sticker may be used to simplify the transition and administration of the labeling. *See* 940 C.M.R. § 22.04(2). The Attorney General argues that these and other characteristics of the Warnings make them narrowly tailored to address the governmental interest. This Court finds the argument persuasive.

The Cigar Companies' attack based on the fourth prong of *Central Hudson* rests on the burden the Warnings impose. *See* Pl.Resp. (Cigar Warnings) at 15–18. The Warnings are described as so large and of such a format as to eliminate print advertising for cigars. They argue that cigar manufacturers are unlikely to advertise if they must devote 20% to the Warning. In contrast, federal regulations do not require a certain proportion of the advertisement, but only require a "conspicuous" or "prominent" warning. Furthermore, there is no affirmative misleading communication on the packaging or in the advertising of cigars that needs such a drastic warning counter-message, unlike the situation in *Zauderer*, 471 U.S. at 652, 105 S.Ct. 2265.

Although these are thoughtful points, and the burden imposed on the cigar industry is not light, the Warnings' requirements are adequately tailored for the government's purpose. It is doubtful that Cigar Companies will stop advertising due to a 20% increase in the cost of running their advertisements (to account for the 20% loss of space). They will simply, it can be imagined, pass that cost along to the consumers or pay for advertisements that are smaller overall. The Cigar Companies have already admitted that their advertising budget is 100 times smaller than the cigarette companies' budgets, *see* Pls.' Opp'n (First Amendment) at 3–4, so the thought that this regulation might cripple the industry is absurd. Furthermore, the packaging requirements leave most of the packaging available for industry use, and incorporate the flexibility of sticker-based compliance. The Attorney General has not overstepped the limits of the First Amendment in crafting his Warnings requirements. The Warnings are a valid exercise of warning-label regulation under the *Central Hudson* framework.

### 3. Commerce Clause Analysis

■ The Cigar Companies have also challenged the Warnings' requirements on the basis of the Commerce Clause. The Cigar Companies argue that commerce in cigars is national in scope, and that individual state regulation over cigar packaging will result in inconsistent standards, will have the effect of controlling conduct outside of the state, and imposes a burden which outweighs any local benefits.

■ It is critical to note at the outset that this is not a case that involves discrimination against out-of-state economic actors. *See, e.g., City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). A discriminatory state regulation would be subject to strict scrutiny, *see id.,* but state laws that are evenhanded in application are generally upheld under the Commerce Clause unless the burden imposed on interstate commerce is excessive in relation to. the local benefits of the laws. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Cigar Regulations do not in any way discriminate among cigar manufacturers. A Commerce Clause analysis of the burdens and benefits of the Cigar Regulations is therefore in order. Before proceeding to that analysis, however, this Court will address the Cigar Companies' arguments relating to a "per se" theory of violation of the Commerce Clause.

a. National Uniformity

The Cigar Companies first challenge the Warnings' requirements on the ground that they require national uniformity. There exist "those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *Southern Pac. Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 767, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). This theory essentially recognizes that the Commerce Clause can, by its own force, pre-empt entire fields of commerce from state regulation. *See Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 128, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Hunt v. Washington Apple Advert. Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ("the Commerce Clause acts as a limitation upon state power even without congressional implementation"). This kind of invalidation of state regulation is rare, however, and is invoked only when a lack of national uniformity would impede the flow of interstate goods. *See Exxon,* 437 U.S. at 128, 98 S.Ct. 2207.

In support of their argument that the cigar market requires uniform national regulation, the Cigar Companies point out that a regulation by California requiring a warning on all cigars has resulted in those California warnings appearing on 90% of all cigar packages in the United States and that the addition of other warnings from other states will result in multiple warnings on the same packaging. *See* Pls.' Resp. (Cigar Warnings) at 3. They fear that several pending proposed regulations could require as many as three changes to the packaging in one year.

The Attorney General, however, makes it clear that the Cigar Regulations do not impose labeling burdens on packages appearing outside Massachusetts. If the Cigar Companies decide to label all their packages the same way, nationally, for efficiency, that is their choice and not the direct result of the Cigar Regulations.

■ The Commerce Clause protects the interstate market, not the right to conduct business in the most efficient manner. *See Exxon,* 437 U.S. at 127–8, 98 S.Ct. 2207. Although the Cigar Companies may prefer internally to consider the cigar market national in scope, there is no inherent reason why the packaging and advertising cannot be managed locally, especially when the regulations allow for sticker-based warnings that can be applied as soon as the cigars enter the destination state from the point of manufacture.

The only conceivable reason to find a "per se" violation of the Commerce Clause here under *Southern Pacific* would be for this court to find that the Cigar Companies' management decisions themselves have created a market that is fundamentally national in scale. To do so would allow manufacturers to avoid state regulation, under the guise of Commerce Clause protection, through marketing decisions that the manufacturers themselves create, promote, and control. Virtually every con-

sumer goods industry could escape state regulation under that proposed standard merely by implementing a centralized packaging and distribution scheme for their products. Those business decisions do not take a market of recreational consumer goods typically sold in local stores and automatically turn that market into one requiring national uniformity in regulation. The Cigar Warnings are not invalid on the basis of *Southern Pacific* or its progeny.

### b. Interference with Commerce in Cigars Outside Massachusetts

Advancing an argument similar to the previous one, the Cigar Companies argue that the practical effect of the Warnings' requirement is to control conduct beyond Massachusetts. They reach this conclusion by adverting to the channels through which cigars are advertised. These include national magazines and the Internet. It is argued that "the critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).

The Cigar Companies claim that they would be required to design, produce, and inventory Massachusetts' labels for all of their transactions in order to ensure their compliance with the Regulations. Using a point-of-sale sticker system would not solve this administrative problem, it is argued, because the Warnings' requirements make it illegal to import for sale cigars without the Warnings. Thus, goes the argument, the labeling must be done prior to entry into Massachusetts, having an impact on commerce outside the Commonwealth. The Cigar Companies also fear that they would have to include the Massachusetts Warnings in national advertisements, including the Internet, that could be viewed in the Commonwealth to satisfy the advertising requirements.

The Attorney General responds that the Cigar Companies have made no effort to determine the actual cost or feasibility of alternative packaging and simply stand behind the status quo for efficiency purposes. He also points out that most cigar advertising is regional and will not require the placement of Massachusetts Warnings on national advertisements unless the Cigar Companies find that more convenient.

■■■ The Cigar Companies have demonstrated areas of legitimate concern where the Cigar Regulations may inadvertently have consequences on out-of-state economic activity. The Supreme Court has made clear, however, that the *indirect* effects · on interstate commerce arising from a state regulation are subject to analysis under *Pike* and not subject to strict scrutiny under a theory of "per se" violation of the Commerce Clause. The Supreme Court acknowledged that "there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach." *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). Even *Healy,* 491 U.S. at 336, 109 S.Ct. 2491, which the Cigar Companies quote to support their "practical effect" argument, invoked the idea of "practical effect," but did so in the context of a regulation that "directly control[ed] commerce occurring wholly outside the boundaries of a State," in the absence of legislative intent to so control commerce. The law struck down in *Healy* required every liquor distiller or producer that sold liquor to wholesalers within New York to sell at price that was no higher than the lowest price the distiller charged wholesalers anywhere else in the United States. *Healy* contained a clear example of a regulation that facially contemplated intrastate transactions but that had a practical *direct* effect of local protectionism, as the Supreme Court recognized. *See id.* at 339, 109 S.Ct. 2491. The Cigar Regulations have neither the intent nor the direct practical effect of discrimination or local

protectionism. It concerns information on the packages of products sold within Massachusetts regardless of who sells them and regardless of what other states are doing to inform their own citizens of the health risks of cigar smoking. Thus the Cigar Companies' concerns about "practical effects" are more properly considered under the *Pike* balancing test, *infra*.

### c. Burdens on Interstate Commerce that Outweigh the Putative Local Benefits

Using arguments similar to those used above, related to the marketing and advertising mechanisms used in the cigar market, the Cigar Companies argue that the Warnings' requirements impose a burden on interstate commerce that outweighs the local benefits behind the Cigar Regulations. This theory emerges from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

The Cigar Companies first argue that *Pike* only applies to exclusively local interests, based on its language, and that matters of national concern are not local interest that can ever outweigh the interests of interstate commerce. This is nonsense. Every local issue has some aspect of interest to the nation as a whole. The Supreme Court has recognized national concerns as legitimate state interests under the Com-

merce Clause. *See, e.g., Minnesota v. Clover Leaf Creamery Company*, 449 U.S. 456, 473, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (conservation of energy and natural resources).

The Cigar Companies point to equally effective alternatives that are less burdensome on interstate commerce, such as a warning display sign at retail outlets, public education, or adopting the California warning. In Massachusetts, however, many such alternatives are already in effect but seem to have had minimal impact on further educating the public about the risks or reducing the incidence of cigar smoking. Although the Cigar Companies are correct that there are alternatives that will have less, or indeed *no*, impact on interstate commerce, the Commonwealth does not need to resort to such alternatives. *Pike* envisions a showing that the burden is "clearly excessive" in relation to local benefits. "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Clover Leaf*, 449 U.S. at 471, 101 S.Ct. 715 (quoting *Pike*, 397 U.S. at 142, 90 S.Ct. 844). The local benefits here are compelling—to educate consumers about what they are purchasing and to inform them of the undisputed health dangers of cigar smoking. The burden imposed on the industry is not excessive, in light of such a strong local interest. Rather, it reflects the implementation of feasible warning labeling similar to that found on other products. This Court need not engage in a fact-intensive balancing analysis of the benefits and burdens. "[O]nly the most minimal sort of balancing, if any, is necessary." *National Kerosene Heater Ass'n v. Massachusetts*, 653 F.Supp. 1079, 1092 (D.Mass.1986) (Skinner, J.).

With the strong local interest clearly shown, it remains to inquire about the burden on interstate commerce. The Cigar Companies have repeatedly claimed that the Regulations may result in costly

modifications to their packaging operations. The Attorney General responds to the Cigar Companies' repeated cries concerning the infeasibility of modifying their packaging systems by pointing to the corporation, John Middleton, Inc., which has been distributing cigars in California with the California warning, and elsewhere without any warning. They also point out that tax regimes in certain states such as Alabama and Arizona require state-specific tax stamps to appear on the packages. In another example, Iowa allows escape of certain tax liabilities by using the wording "two for the price of one" rather than "buy one get one free," and Cigar Companies have modified packaging for those purposes. *See* Def.'s Opp'n (Cigar Warnings) at 5.

The fact is that modern companies are capable of adapting to the packaging requirements of individual states and have been doing so in many different industries. Although this change may require retooling of certain structures, or coordination with the retailers, the Warnings labeling is possible and reasonable. By relying on a national system of packaging, the Cigar Companies have established an efficient labeling system, but efficiency fails to overcome the strong local interests of the Commonwealth in protecting the health and consumer choice of its citizens. may be time for Congress to step in with a national cigar labeling program and pre-empt the states in this area, but until it does so, it is unreasonable to force Massachusetts to wait and allow its citizens to remain deprived of important consumer health information.

The Cigar Companies do raise legitimate concerns about certain portions of the Cigar Regulations which seem especially likely to burden activities outside the state, depending on their interpretation. In particular, these concerns relate to the portions of the Cigar Regulations which seem to require that a Massachusetts Warning be present on the cigar package when the package enters the Common-wealth, and portions that seem to require warnings on national and Internet-based advertising. These portions are subject to a proper narrowing construction by this Court. *See Rhode Island Assoc. of Realtors, Inc. v. Sheldon Whitehouse,* 199 F.3d 26, 35–36 (1st Cir.1999) ("Even when state officials fail to offer an authoritative interpretation of a state statute, a federal court considering a pre-enforcement challenge sometimes will presume a narrowing construction to which the law is fairly susceptible.") (citing *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ).

This Court holds that the language in 940 C.M.R. § 22.04(2) can be interpreted to allow compliance when the warning labels are affixed by the *last* retailer on the chain of commercial distribution prior to sale. That is because the failure to include the Warning is rendered a "deceptive act or practice" not when the goods cross the Massachusetts' state line, but rather when merchants "import for sale" the cigars. *See* 940 C.M.R. § 22.04(1)–(2). In order to lessen the Cigar Regulations' burden on interstate commerce, this Court construes that language to mean that the Cigar Companies may affix the warning sticker to the cigar package when the package has reached the ultimate "importer *for sale,*" namely the retail merchant, so long as the sticker is present by the time any end-consumers are able to view the package.

The word "distribute" also appears in these sections, *see id.,* but incidental "distribution" for the purpose of delivering the package through the stream of commerce to the end merchant ought not be captured by the statute. Rather, this Court rules that the word "distribute" refers to instances in which persons subject to the Cigar Regulations distribute directly to the end consumer, for example at factory outlets. A construction which would be broad enough to require the label to be affixed while the package is still in the hands of distributors or sub-distributors does nothing to further the purpose of the

Regulations since it has no effect on the message ultimately presented to the cigar consumer. The Attorney General would surely agree that the ultimate local interest served by the Warnings is to inform consumers of the dangers of smoking cigars. Requiring a warning to be attached before consumers are in a position to see it is unnecessary to effectuate the goals of the law, and poses a significant burden on activities taking place outside the Commonwealth. The regulation's implementation should be limited to prevent that imbalance of interests.

This Court also has grave concerns that the Cigar Regulations, as they are written, might apply impermissibly to national magazines available for purchase in Massachusetts, or to the Internet. The Regulations render it an "unfair or deceptive act or practice" for any person "to advertise or cause to be advertised within Massachusetts any cigar or little cigars" without including the warnings comprising 20% of the area of the advertisement. 940 C.M.R. § 22.05. This broad language capturing the acts of persons who merely "cause to be advertised" cigar products seemingly imposes upon advertisers in national magazines, such as *Cigar Aficionado* and *Smoke,* the burden of including a Massachusetts Warning in any magazine that distributes any of its copies to any Massachusetts readers. At oral argument, the Attorney General agreed that the Cigar Regulations could be construed to capture national magazines even though that was not the intent of the Commonwealth. *See* Tr. of Mot. Hr'g, Dec. 2, 1999, at 7. Such an interpretation would place a great burden on interstate commerce since it would require the Massachusetts Warning to be carried by a national magazine in order to ensure that any copies ending up in Massachusetts carry the Warning. This Court does acknowledge that the Commonwealth has a strong local interest in providing cigar information to its citizens who read national publications. It would be unfortunate if the Cigar Companies took advantage of this Court's limiting instruction to

skirt the law by increasing their advertising in national magazines. The Cigar Regulations as a whole, however, provide ample opportunity for warning Massachusetts consumers, including local magazines, and on the packages themselves. Thus, the Commonwealth's local interest in capturing national magazines is outweighed by the burden it would place on interstate commerce. This Court holds that cigar advertisements in magazines or other print media that are truly national in distribution need not include the Massachusetts Warnings. If a magazine or other print medium has a "Massachusetts edition" in which the advertisements are selected or designated solely or especially for a Massachusetts audience, the burden on interstate commerce is minimal because the Cigar Companies can easily add the Warnings to the Massachusetts edition. In those cases only, the cigar advertisements in that magazine or other print medium are required to comply with the Warnings' requirements.

■ The Internet poses a similar issue by virtue of the fact that Internet-based advertising is targeted at no state in particular, but at all states in general. Furthermore, the dynamic nature of text and images appearing on an Internet browser does not lend itself well to a regulation that sets aside a percentage of "area" of an advertisement. The Attorney General acknowledged, during oral argument, the uncertainty of the application of the Regulations to the Internet. *See* Tr. of Mot. Hr'g, Dec. 2, 1999, at 11. He later provided a letter to the Court expressing the position that the general warning requirement set forth in 940 C.M.R. § 22.05(1) applies to Internet advertising, while the Regulations specifying size and format requirements in 940 C.M.R. § 22.05(2) would not. *See* Letter from Jeffery D. Clements to Young, C.J. of Dec. 23, 1999 at 2. Although this may be the aspiration of the Commonwealth now, that construction has been expressed to the Court informally, not via the deliberate and important pro-

cess of rulemaking. This Court will thus give a narrow construction to the provisions, and has no occasion to consider broader construction. Since cigar advertisements appearing on the Internet are not "within Massachusetts" [18] and since it seems plain that the Attorney General, in creating the Warning provisions, contemplated a tangible paper medium, this court holds that Internet advertisements are not subject to the Warnings' requirements in either 940 C.M.R. § 22.05(1) or (2).[19]

## VI. CONCLUSION

For the reasons set forth above, this Court declares that both the Tobacco Regulations and the Cigar Regulations, as construed herein, are valid exercises of the authority of the Attorney General with the sole exceptions of the parameters of the point-of-sale Tobacco Regulations, 940 C.M.R. § 21.05(5)(b), as amended through Jan. 19, 2000, and the cognate Cigar Regulations, 940 C.M.R. § 22.06(5)(b), as amended through Jan. 19, 2000. Additionally, this Court holds that cigar advertisements in national magazines and in other national media are exempt from the Warnings requirements of 940 C.M.R. § 22.05. Nothing herein prevents the Attorney General from adopting a broader construction of his regulations than this Court here

affords, so long as he proceeds by express formal rulemaking subject to challenge by the affected parties. Likewise, he may immediately choose to adopt some parameter for point-of-sale regulation so long as he proceeds in like fashion and justifies his delineation. Those matters are not, however, now before this Court. The cross motions of the parties are thus allowed in part and denied in part in accordance with this opinion. [Docket Nos. 32, 48, 78, and 84.] Judgment will enter as declared above.

SO ORDERED.

---

18. This conclusion seems accurate even in light of the Attorney General's desired use of the definition of "advertisement" in its Retail Advertising Regulations, 940 C.M.R. § 6.00. *See Letter of Jeffrey D. Clements to Young,* C.J. of Dec. 23, 1999 at 1. In that definition, "oral, written, graphic, or pictorial representations" within Massachusetts are contemplated, as is "any representation disseminated within Massachusetts if the advertisement is directed to consumers in Massachusetts." *Id.* at 1, n. 1 (quoting 940 C.M.R. § 6.01). Internet advertising is not directed to consumers in Massachusetts in particular, and therefore fails to fit the definition.

19. Even if the Commonwealth were explicitly to include Internet advertising in the Warnings' requirements, that regulation would likely run into significant difficulty under *Pike* due to the heavy burden it would place on interstate commerce. *See American Libraries*

*Ass'n v. Pataki,* 969 F.Supp. 160, 169 (S.D.N.Y.1997) (using the Commerce Clause to strike down a New York statute making it a crime to disseminate obscene materials to minors via the Internet).

The Court's ruling with respect to the Internet does not necessarily compel the same conclusion with regard to electronic mail ("E-mail"). To the extent that E-mail represents an electronic replacement of the traditional letter and requires that the disseminator have some idea of the location (though not necessarily geographical situs) of the receiver of the advertisement, its regulation might impose a lesser burden on interstate commerce. *But see id.* at 171–72 (E-mail users cannot predict the geographical destination or origin of messages).

The Court has no occasion to consider these additional issues and merely reflects on them for the benefit of thorough analysis.